**COURT OF APPEALS
DECISION
DATED AND FILED**

**October 16, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP530-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF1332

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

BENJAMIN J. HORN,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: NICHOLAS J. McNAMARA, Judge. *Affirmed.*

Before Graham, P.J., Blanchard, and Kloppenburg, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   At a bench trial, the circuit court found Benjamin Horn guilty of two counts of second-degree sexual assault of an intoxicated person

in violation of WIS. STAT. § 940.225(2)(cm).[1]  Horn moved for postconviction relief, contending that his trial counsel was constitutionally ineffective in multiple respects and, in the alternative, that a new trial is called for in the interest of justice.  After considering evidence and argument at a series of postconviction hearings, the court denied the motion.  In this appeal, Horn challenges the judgment of conviction and the order denying his postconviction motion.  We conclude that Horn fails to show that his trial counsel was ineffective or that a new trial is merited in the interest of justice.

## BACKGROUND

¶2     Horn and A.B. were both undergraduate college students when they went on a date in downtown Madison one night in April 2019.[2]  They both consumed alcohol at multiple bars and walked together from the last bar to Horn's nearby apartment building and then into his unit.

¶3     The State alleged that: after they were in Horn's residence, Horn had both penis-to-vagina intercourse and penis-to-anus intercourse with A.B.; in each instance of intercourse, A.B. was under the influence of an intoxicant to a degree that rendered her incapable of giving consent; and in each instance Horn had the purpose to have sexual intercourse with A.B. while she was incapable of giving consent.  The State charged Horn with two counts of second-degree sexual assault

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] To protect the privacy of the victim, we refer to her using initials that do not correspond to her real name.  *See* WIS. STAT. RULE 809.86.

2

of an intoxicated person.[3]   As explained further below, Horn's defense at trial included his testimony that he woke up the next morning wearing his underwear and with no recollection of having intercourse with A.B.  Horn's position was that if there had been any intercourse, contrary to his best understanding of what had occurred, then it was consensual and further that the prosecution was not able to prove that he knew that A.B. was not capable of consenting.

¶4     The circuit court accepted Horn's waiver of his right to a jury trial and the case proceeded to a bench trial.  At trial, the State called five witnesses: A.B.; a friend of A.B.'s with whom A.B. interacted soon after the alleged assaults; Mollie Jesberger, a sexual assault forensic nurse examiner ("the SANE nurse") who examined A.B. on the day after the alleged assaults; Jennifer Setlak, a senior DNA analyst from the Wisconsin State Crime Laboratory who analyzed the DNA evidence; and a police detective whose investigative work on this case included interviewing both A.B. and Horn.  At trial, during the direct examination of A.B., the prosecutor played street surveillance camera video recordings that had captured video images (without sound) showing Horn and A.B. walking together from the last bar to his residence shortly before the alleged sexual assaults.

¶5     Summarizing broadly, the prosecution relied heavily on the following testimony by A.B., including the portions of her testimony that were consistent with statements that she gave to police following the alleged assaults.

---

[3] As applied to this case, the following are the five elements of WIS. STAT. § 940.225(2)(cm): (1) Horn had sexual intercourse with A.B. (penis to vagina for one count and penis to anus for the other); (2) at the time of the intercourse, A.B. was under the influence of an intoxicant; (3) A.B. was under the influence of an intoxicant to such a degree that it rendered her incapable of giving consent; (4) Horn had actual knowledge that A.B. was incapable of giving consent; and (5) Horn had the purpose to have sexual intercourse with A.B. while A.B. was incapable of giving consent. *See* WIS JI—CRIMINAL 1212.

A.B. was feeling lethargic and struggling to maintain ordinary consciousness on the night of the alleged assaults, apparently from the effects of alcohol that she had consumed that night, starting before Horn and A.B. walked from the last bar to Horn's residence. Her ability to function deteriorated significantly by the time they were in Horn's residence. A.B. was not interested in having sex that evening, and she had a tampon in her vagina for her menstrual period before and during the alleged assaults. She came to consciousness in the apartment unit to find Horn taking off her pants and then causing her extreme pain by penetrating her vagina with his penis. He also forced her to perform oral sex on him,[4] and he penetrated her anus with his penis at a time when she was physically unable to speak. Horn stopped sexually assaulting A.B. only when she told him that she was going to throw up, at which time she retreated to a bathroom and eventually fled Horn's residence while he seemed to be sleeping.

¶6      The prosecution further highlighted testimony by the SANE nurse that, in examining A.B., the nurse detected tears to vaginal tissues and an anal tear. Also emphasized by the prosecution were reasons to doubt Horn's trial testimony that, as the prosecutor characterized it, Horn was a "young man who's had a couple drinks" who then "conveniently blacked out" "at the operative moment[, when] he's … accused of a fairly brutal rape[,] and does not remember anything until the next day."

¶7      Horn's trial counsel called two witnesses: Horn and a police officer whose investigative work on this case also included interviewing A.B. Again summarizing broadly, trial counsel emphasized that the circuit court was not

---

[4] The allegation of forced oral sex was not charged as a crime by the State.

permitted to shift to the defense the burden of showing what happened in Horn's residence if facts were unclear. For example, it would have been improper for the court to assign to the defense the responsibility of establishing the degree to which A.B. was or was not too impaired to consent, or the degree to which she appeared that way to Horn. Counsel argued that the evidence supported the conclusion that, on the day after the alleged assaults, and before A.B. decided to undergo a SANE exam, A.B. engaged in a "reconstructive process" that produced false memories. These false memories, counsel argued, arose from her general fears about sexual assaults perpetrated on the University of Wisconsin-Madison campus, instead of actually recalling Horn's conduct. The result was that, in course of trying to "make sense of a very confusing situation" in Horn's residence, A.B. came to falsely believe that Horn had sexually assaulted her.

¶8 Another major point pursued by trial counsel involved the street surveillance camera videos showing part of the walk that Horn and A.B. took from the last bar to Horn's apartment building. The defense submitted that there were significant discrepancies between, on the one hand, how A.B. appeared in the video recordings, and on the other hand, A.B.'s statements to others and her trial testimony about her alleged limited capacity to function and interact normally with Horn at times that night. Counsel argued that it was impossible to reconcile A.B.'s testimony that, as characterized by counsel, A.B. was "essentially a rag doll, she's essentially paralyzed," with the fact that, again according to counsel, when she is seen walking with Horn in the videos, she is "never stumbling."

¶9 The circuit court found Horn guilty on both charges and explained its reasoning in an extensive oral ruling. *See* WIS. STAT. § 972.02(3) (In a criminal case bench trial, "the court shall make a general finding and may in addition find the facts specially."). After the court sentenced Horn, Horn retained new counsel

5

and moved for postconviction relief. As pertinent to this appeal, Horn raised the same ineffective assistance and interest of justice issues that he pursues in this appeal.

¶10    The circuit court held a series of evidentiary hearings on the postconviction motion. Witnesses, including trial counsel, were called by both sides. *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (testimony of counsel whose performance is challenged as ineffective may be necessary to allow the court to assess the reasonableness of counsel's conduct). Exhibits offered by the parties included affidavits and correspondence that trial counsel had sent to Horn before trial that addressed various litigation options for Horn to consider in consultation with counsel.

¶11    In a detailed, written decision, the circuit court denied the motion, addressing each of the ineffective assistance claims and the interest of justice argument. Horn appeals.

## DISCUSSION

### I.  Ineffective Assistance of Trial Counsel

#### A.  Legal Standards

¶12    Criminal defendants have a constitutional right to the effective assistance of counsel. U.S. CONST. amend. VI; WIS. CONST. art. I, § 7; *State v. Sanchez*, 201 Wis. 2d 219, 226, 548 N.W.2d 69 (1996) (the right to counsel under the Wisconsin Constitution is "interpreted identically" to the federal Sixth Amendment right to counsel). In order to establish ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and also that the deficient performance prejudiced the defense. *Strickland v.*

6

*Washington*, 466 U.S. 668, 687 (1984); *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 ("If the defendant fails to satisfy either prong, we need not consider the other.").

¶13 We review an ineffective assistance of counsel claim using a mixed standard of review. *State v. Savage*, 2020 WI 93, ¶25, 395 Wis. 2d 1, 951 N.W.2d 838. The circuit court's factual findings, including findings regarding counsel's conduct and strategy, will not be overturned unless they are clearly erroneous, but we review de novo whether counsel's performance constitutes constitutionally ineffective assistance. *Id.*

¶14 To demonstrate deficient performance, the defendant must show that counsel "'made errors so serious that [he or she] was not functioning as the "counsel" guaranteed ... by the Sixth Amendment.'" *Id.*, ¶28 (quoting *Strickland*, 466 U.S. at 687). We presume that counsel's performance fell within the wide range of reasonable professional assistance, and we will grant relief only when the performance was objectively unreasonable under the circumstances. *Id.*, ¶28. Specifically, "'[c]ounsel's decisions in choosing a trial strategy are to be given great deference.'" *Breitzman*, 378 Wis. 2d 431, ¶38 (alteration in original; quoted source omitted). "If trial counsel testifies at the *Machner* hearing that the choice under attack was based on a trial strategy, which the circuit court finds reasonable, it is 'virtually unassailable' and the ineffective assistance claim fails." *State v. Sholar*, 2018 WI 53, ¶54, 381 Wis. 2d 560, 912 N.W.2d 89 (quoted source omitted).

¶15 Prejudice is demonstrated by showing a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*, ¶33.

**B. Topics of force allegedly used by Horn, and pain and injuries allegedly experienced by A.B.**

¶16    Before addressing each ineffective assistance issue, we identify a set of related topics that arise across the issues to provide context. This involves evidence that could support arguments that Horn used any particular amount of physical force, or that he caused pain or injury to A.B., during either or both of the two charged acts of sexual intercourse. As reflected in the elements summarized *supra* at note 3, the State had to prove, among other things, that A.B. was not capable of giving consent as a result of intoxication, that Horn knew that she was not capable of consent, and that he had a purpose to have sexual intercourse with her when she was incapable of consenting. The requirement that the State prove these elements did not obligate the State to prove that Horn used any particular amount of physical force during either act or caused pain or injury to her. However, in his postconviction motion and on appeal, Horn argues that trial counsel was deficient in missing the opportunity to show that A.B. was not credible when she testified that she experienced pain during both acts. This is based on what Horn submits was the lack of injuries to A.B. reflected in the SANE exam and what Horn further submits was the absence of DNA evidence associated with Horn that should have been detected based on A.B.'s testimony.[5]

¶17    A.B. testified that it caused her "extreme pain" when Horn put his penis into her "very dry" vagina, that it caused her "splitting pain" when his penis pushed a tampon against her cervix, and that, when Horn penetrated her anus with

---

[5] Following what appears to be the general usages of the parties and the circuit court, we use the term "injuries" broadly, to include any sort of marks or tears to parts of A.B.'s body, no matter how small or possibly superficial, that were referenced by any witness, and not necessarily limited to seeming indicia of unusually great force.

his penis, this was "dry and extremely painful," and that she had "a tearing pain, really intense." A.B. also testified that she had vaginal and anal pain for two or more days following the assaults. For additional context on the topics of force or injury, the circuit court, in finding Horn guilty on both counts at trial, said that the court relied in part on evidence of "sexually caused injuries, that is, [injuries] caused by [Horn] in sexual acts of some sort; almost certainly penis to vagina, penis to anus."

¶18    To sum up on this contextual point, neither the amount of force used by Horn in allegedly assaulting A.B., nor the amount of pain she testified to experiencing, nor the amount and severity of the injuries that allegedly resulted, directly bear on an element of the offense charged for the two alleged acts of intercourse. However, Horn's postconviction arguments frequently amount to contentions that trial counsel should have made better use of evidence on those topics to impugn A.B.'s credibility and to rebut inferences that, assuming that the two charged acts of intercourse occurred, A.B. was too incapacitated to consent and that Horn knew she was incapable of giving consent and had the purpose to have intercourse with her while she was incapable of giving consent.

¶19    With that context in mind, we address Horn's ineffective assistance claims in turn.

### C. Decision not to call OB/GYN physician

¶20    Horn may intend to argue that his trial counsel was ineffective in failing to call as a trial witness Dr. Timothy Raichle, a physician who practices in the area of obstetrics and gynecology (OB/GYN physician) and who testified in the postconviction hearings. At the request of postconviction counsel, Dr. Raichle reviewed materials that included the SANE nurse's report and photographs from

9

the examination, as well as A.B.'s trial testimony and police accounts of her statements to police. Dr. Raichle opined about the nature of the injuries to A.B., concluding that only "minor injuries" occurred and that "no findings upon my review of the material … would suggest that the vaginal and possible anal penetration was non-consensual," and that the injuries "may, in fact, have occurred during consensual intercourse." We conclude that Horn concedes that he cannot show deficient performance in failing to call Raichle.

¶21 After the State makes two supported arguments that would each defeat a showing of deficient performance by trial counsel on this claim, Horn fails to provide a response to either argument, conceding both. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

¶22 One of the State's unrebutted dispositive arguments is based on trial counsel's testimony that Horn made an informed financial decision not to identify an OB/GYN physician as a potential trial witness, in part because the defense would have the opportunity to call Debra Donovan, a forensic nurse examiner who was retained by the defense and whose expert witness fees were much lower than a physician would charge. This testimony was supported by correspondence that counsel provided to Horn before trial. Part of the rationale was that, if it made sense to call Donovan at trial, Donovan could generally assist the defense in covering the same relevant issues that an OB/GYN physician could cover.[6]

---

[6] Separately below, we explain why we conclude that trial counsel provided a reasonable strategic reason for not calling Donovan as a trial witness, and, therefore, Horn fails to show deficiency on that issue.

¶23 The State's other unrebutted dispositive argument is that Dr. Raichle's testimony potentially conflicted with one alternative basis for the circuit court to have reasonable doubt about the charges. The defense theory, advanced by counsel at trial, was that Horn did not have either vaginal or anal intercourse with A.B.—regardless of whether A.B. was incapacitated or appeared to be incapacitated—consistent with Horn's trial testimony that he believed that he did not have any form of intercourse with A.B. Horn testified that this belief was based on his limited memories of what occurred in his apartment that night and his recollection that he woke up in the morning with his underwear still on and with no signs of blood or other indications that he had engaged in intercourse. This would also be consistent with the defense theory, summarized above, that it was only on the day following the alleged assaults that A.B. came to the (allegedly false) conclusion that Horn had sexually assaulted her. The potential conflict in Dr. Raichle's testimony was that he was "absolutely" confident, based on the SANE exam evidence, that A.B. had engaged in or been subjected to vaginal intercourse and that she might have engaged in or been subjected to recent anal intercourse.

### D. Failure to call DNA expert and to address DNA evidence differently

¶24 Horn makes a series of ineffective assistance arguments that are based in part on the testimony of another witness called by the defense at the postconviction hearing, Dr. Alan Friedman. Friedman holds a doctorate in molecular genetics and cell biology and specializes in forensic DNA issues. Horn argues that, with the benefit of Friedman's testimony, trial counsel could have avoided the following ineffective conduct: (1) failing to emphasize, and place in proper context at trial, evidence that male DNA was not detected on an anal swab collected in the SANE exam, and more generally failing to argue that A.B.'s

account was undermined by the detection of potentially incriminating DNA on only limited pieces of evidence; and (2) failing to adequately account for a presumptive positive test for semen detected on vaginal and external genital swabs. We address these two sets of arguments in turn.

¶25 *Absence of inculpatory DNA evidence on the anal swab and on other pieces of evidence*. Horn argues that trial counsel was ineffective in the way that counsel addressed the detection, or lack of detection, of male DNA, or DNA otherwise associated with Horn, on evidence collected in the SANE exam. For the following reasons, we conclude that Horn fails to show that counsel's performance on these issues was not objectively unreasonable under the circumstances presented to counsel.

¶26 We begin with the lack of male DNA detected on the anal swab. A.B. reported to the SANE nurse that she had not showered or defecated since the alleged assaults. Horn suggests that trial counsel was deficient in failing to sufficiently call to the circuit court's attention the fact that no male DNA was detected on this swab and in failing to call Friedman as a witness, because Friedman's testimony would have established that this evidence was highly exculpatory. Horn emphasizes A.B.'s testimony that the anal intercourse was painful, which Horn submits establishes that there would necessarily have been significant, direct friction between his penis and A.B.'s anus, with a corresponding shedding of Horn's DNA in A.B.'s anus, assuming that Horn did not put on a condom immediately prior to the alleged acts of intercourse.[7] Against that factual

---

[7] A.B. testified that when Horn penetrated her vagina with his penis "[i]t felt like someone was penetrating me without a condom."

background, Horn argues that it was significant that Friedman testified that the tests used to detect the presence of DNA are generally "extraordinarily sensitive" and that, "because of that sensitivity[, Friedman] would expect to see DNA transfer under the circumstances" of "rough and forceful" intercourse.

¶27 The fact that male DNA was not detected on the anal swab was favorable evidence to support a defense theory that Horn did not have anal intercourse with A.B. But trial counsel *did* make use of this favorable evidence, and the circuit court was free to give it whatever weight the court thought it merited in relation to all other probative evidence, including on the issue of whether anal intercourse occurred. Evidence admitted at trial included the report of State DNA expert Setlak, which unambiguously stated that male DNA was not detected on the swab. During the trial, trial counsel pointed out that DNA which could be attributed to Horn was found exclusively on "external swabs," that is, swabs not taken from within A.B.'s vagina or anus.[8] Counsel argued that this fact was "absolutely consistent with Mr. Horn's testimony that … what he believes happened … is that there was no sexual intercourse." Further, Horn does not direct us to any statement by either attorney or by the court at trial to the effect

---

[8] More specifically, the State DNA expert testified that Horn's "Y-STR DNA profile" was identified on the external genital swab, the mons pubis swab, and on the waistband of A.B.'s underwear. The expert testified that this profile, based only on the Y chromosome that is passed from fathers to sons, would not be found in more than one in every 5,463 individuals in the United States population.

Trial counsel argued to the circuit court at trial that these did not represent close matches and that the DNA could have been left by "enumerable people, … probably thousands of people with the same [Y-STR] DNA profile in the country." In the alternative, counsel argued, Horn's DNA could have been transferred to these locations in many ways that did not involve vaginal or anal intercourse but because the two had other types of physical contact, after which A.B. could have transferred Horn's DNA to various areas of her body.

that, or reflecting a belief that, male DNA was found on the anal swab.[9]  We are not persuaded that it was deficient performance for counsel not to frame this particular point more emphatically or repetitively.

¶28    As for the purported necessity of Friedman's testimony on this issue, Horn now argues that Friedman would have "disproved [A.B.'s] testimony that she was anally penetrated in a rough, unprotected manner."  But this greatly overstates the nature of Friedman's testimony, which was not nearly as precise or conclusive as Horn contends in excluding the possibility that Horn's penis penetrated A.B.'s anus, whether or not that occurred in what Friedman might characterize as being in a "rough" manner.

¶29    Explaining our conclusion further, the fact that A.B. testified that she experienced the anal intercourse as "dry and extremely painful," "really intense," and involving "a tearing pain," could have represented any of broad range of types of pains and sharp discomforts for a person experiencing the following shocking circumstances: being subjected to unconsented, unexpected anal intercourse by the assailant's penis, while the person was in the assailant's residence, at a time when the person was incapacitated in various ways.  Trial counsel could not necessarily count on the circuit court equating A.B.'s testimony about pain that she experienced during what she described as a highly traumatic event with whatever Friedman exactly meant by "rough" anal intercourse.

---

[9] Horn asserts that the circuit court demonstrated a lack of awareness of the fact that no male DNA was detected on the anal swab when the court, in summarizing its findings at trial, said that the fact that "DNA consistent with Horn was found on swabs taken from parts of [A.B.'s] body" supported A.B.'s testimony.  But Horn's assertion is not supported by the record. In the cited passage, the court made a well-supported point about DNA that was detected on an external genital swab and on A.B.'s underwear, and the court did not say anything inconsistent with the fact that no male DNA was detected on the anal swab.

¶30 Further, Friedman did not testify to a degree of scientific certainty about the DNA results that must necessarily, or to a high degree of probability, be found on an anal swab taken after anal intercourse that has occurred in some well-defined manner. In the affidavit that Friedman submitted, his concluding averment on this issue was only that the "absence of male DNA in this sample is inconsistent with a description of unprotected anal penetration, particularly in the absence of lubrication." The substance of Friedman's testimony on this issue was only that he personally "would expect to see" male DNA results based on an assumption of "rough and forceful" intercourse. It is true that Friedman testified that DNA tests are designed to be sensitive enough to detect a single cell in a sample. But that broad proposition would not have added meaningfully to the way the circuit court at trial was able to assess the absence of male DNA from the anal swab as it related to the issue of whether there was anal intercourse. And in any case, the broad proposition is not significantly stronger that what counsel argued on this point at trial. Trial counsel also pursued focused cross-examination of State DNA expert Setlak regarding the ease with which the DNA of one person may be transferred to another person, providing an additional basis for the circuit court to have reasonable doubt based on the absence from the SANE exam samples of more male DNA or DNA associated with Horn.

¶31 On a related note, Friedman's assertions about DNA transfers in this context was potentially undermined by the postconviction testimony of the State DNA expert that this expert was not aware of any published research "regarding how vigorous sex is and how much DNA is left" after "vigorous sex," and that this expert believed that she would be aware of any such research results if they existed, even if there are studies establishing the general proposition that friction between the body parts of two people can result in DNA transfers.

¶32    Turning to the balance of Horn's related arguments, Horn relies on Friedman's testimony for the proposition that, if there had been vaginal intercourse as described by A.B., then male DNA should have been detected through cervical or vaginal swabs.   But these arguments were significantly undermined by the fact that Friedman conducted his analysis without taking into account that A.B., according to her unrebutted testimony, had a tampon in her vagina at the time of the alleged assaults, which she removed before the SANE exam.   Once this was called to his attention, Friedman testified: "If [A.B.] removed the tampon, that certainly could have removed some of the DNA.   If there was foreign DNA in the vagina, that could have been removed."   This potential impeachment of Friedman limits the value of his testimony as a basis to show that trial counsel's performance was deficient.

¶33    *Lack of semen detection*.   Horn argues that trial counsel "botched" addressing the fact that the presence of semen on vaginal and external genital swabs collected during the SANE exam could not be confirmed.   As context to this argument, at trial, the prosecution elicited testimony from Setlak that a prostate-specific antigen (PSA) test of these swabs showed a "presumptive positive" result for the presence of semen.   Horn contends that Friedman should have been called as a witness at trial to explain to the circuit court why the "presumptive positive" result here did not represent a reliable marker for semen. But the State on appeal provides a supported argument that the evidence at trial, together with statements that trial counsel made at trial, clarified for the benefit of the court that there was no reliable evidence of semen on these swabs and that no sperm cells were detected.   Horn concedes the point through silence with one exception that we address beginning in the following paragraph.   If the exception

is put to the side, Horn's concession defeats the proposition that Friedman would have added anything on this issue not already known to the circuit court at trial.

¶34    The exception involves a statement made by the prosecutor in rebuttal closing argument. This occurred when the prosecutor listed reasons for the circuit court to find beyond a reasonable doubt that "there was sexual intercourse," contrary to Horn's testimony that he believed that there had been no intercourse of any kind. As part of this rebuttal argument, the prosecutor said that "the DNA initial screening … found [the] presence of semen, yet not sperm."

¶35    We assume without deciding that the prosecutor's statement in argument had the potential to mislead the circuit court about a finding of semen, and we further assume without deciding that it was deficient performance for counsel not to object to it. With those assumptions, we conclude that Horn fails to show a reasonable probability that, if counsel had objected to this brief reference, the result of the proceeding would have been different. The circuit court determined, in the course of denying the postconviction motion, that it was always clear to the court that semen was not detected: "The potential uncertainty of the … presumptive test for semen was never an issue because the State's analyst never found semen." Further, Horn fails to provide a reason for us to think that the court at trial could reasonably have relied, or did in fact rely, on this passing reference in argument to determine that semen was detected, despite the lack of evidence to this effect. This would have been contrary to the rule, no doubt familiar to the experienced circuit court, and reflected in WIS JI—CRIMINAL 160, that "arguments and conclusions and opinions" given by attorneys in closing arguments "are not evidence."

### E. Decision not to call retained forensic nurse examiner

¶36 Horn argues that it was ineffective assistance for trial counsel to decide for strategic reasons not to call as a witness at trial forensic nurse Debra Donovan, after counsel retained her for consultation and obtained a report from her. Based on Donovan's testimony at the postconviction hearing, Horn argues that it was deficient performance not to call Donovan at trial because she had an essential role to play in contradicting the testimony of the SANE nurse about the nature of injuries that the SANE nurse observed during her examination of A.B. Horn argues that Donovan's testimony would have helped counsel undermine the prosecution arguments that: (1) vaginal and anal intercourse occurred; and (2) A.B. accurately described painful acts of intercourse that occurred while Horn would have been aware that A.B. could not consent due to incapacity. As postconviction counsel put it in questioning trial counsel, "if the injuries were so severe and so many in quantity," as the SANE nurse testified, then that "made it harder [for trial counsel] to argue that [A.B.] in fact engaged in just consensual sexual behavior with" Horn. We now explain why we conclude that trial counsel provided a reasonable strategic reason for not calling Donovan and, therefore, Horn fails to show deficiency on this issue.

¶37 The following additional background is pertinent. During the postconviction hearing, trial counsel testified that he retained Donovan in October 2020, in advance of the December 2020 trial. At counsel's request, Donovan reviewed the SANE nurse's report and the photographs that the SANE nurse took of various parts of A.B.'s body, and Donovan produced her own report for counsel. Before he retained Donovan, counsel assumed that the SANE nurse's report accurately identified the number and severity of injuries to A.B., and counsel hired Donovan with the primary goal of seeing if she could testify that the

number and types of injuries could have been consistent with intercourse to which A.B. consented. But counsel learned from Donovan's report that Donovan questioned the number of the injuries and the severity of some injuries documented by the SANE nurse.

¶38 More specifically, in response to the following question, Donovan gave the following answers in her written report.

> Question posed by counsel: "Is it possible that the genital injuries [A.B.] suffered were caused during consensual sexual intercourse (not forced)?
>
> Donovan's answer: **"While it is <u>possible</u> for genital injuries to occur during consensual sexual intercourse, the <u>amount & severity</u> of documented injuries to [A.B.'s] genital area are significant and far more likely to be caused from a non-consensual sexual encounter. However, after viewing the photographs taken by the nurse, I can only identify two of the injuries from those photographs that clearly represent the injuries [that the SANE nurse] reports in her assessment."**

(All emphasis in original.) In the balance of her report, Donovan walked through aspects of the SANE nurse's report and the photographs and gave various opinions based on those sources.

¶39 Counsel testified at the postconviction hearing that he interpreted Donovan's report and his other communications with Donovan to mean that Donovan concluded that the SANE exam results could support a finding that Horn and A.B. had consensual intercourse, but that it was, in the words of trial counsel, "far more likely that these injuries were caused from a non-consensual sexual encounter." Based on this, counsel testified, he feared that Donovan's testimony could assist the prosecution because "it suggests that this was more likely a forced or non-consensual episode of intercourse." At the postconviction hearing, counsel

testified that he now interpreted Donovan's report as potentially meaning that *only if* the SANE nurse's documentation of injuries was accurate would it be far more likely that they were caused by a non-consensual sexual encounter.

¶40   When the SANE nurse testified at trial, trial counsel got her to establish that the injuries she documented could have been the result of consensual intercourse, but counsel did not challenge the number and severity of injuries that the SANE nurse said she had documented. Counsel testified in the postconviction motion hearing that he made the strategic decision, after considering the SANE nurse's testimony, that calling Donovan would "likely" do the defense "more harm than good." The "driving factor" behind this decision, counsel testified, was that the SANE nurse "essentially conceded that" the injuries to A.B. that she documented "could have been consistent with either consensual or non-consensual sex," which counsel testified was an important concession that could be used as a building block for defense arguments. This concession would support the alternative defense position that, even if the circuit court found that the two forms of intercourse occurred, the court should also find that the prosecution failed to prove beyond a reasonable doubt that Horn was aware that A.B. was too incapacitated to give consent.

¶41   Trial counsel also testified that he believed that the SANE nurse's testimony was overall more favorable to the defense than Donovan's potential testimony would have been, because Donovan would have had to concede, consistent with her report to counsel, that if the SANE nurse's documentation of injuries was accurate, then the injuries to the genital area "are significant and far more likely to be caused from a non-consensual sexual encounter." In other words, while counsel understood that Donovan questioned various interpretations of injuries by the SANE nurse, counsel was concerned that Donovan would have

hurt the defense by testifying that, if the circuit court credited the SANE nurse's testimony about there being significant injuries, then the injuries were most likely the result of non-consensual acts of intercourse.

¶42 Supporting trial counsel's decision not to call Donovan were her acknowledgements, during her postconviction testimony, of all of the following: because the SANE nurse conducted the SANE exam, the SANE nurse had superior, first-hand vantage points over Donovan in assessing the nature of injuries; Donovan, unlike the SANE nurse, had never examined A.B. at any time; and interpretations of photographic evidence can be difficult and misleading, as, for example, when camera images reflect "artifact[s]." Further, Donovan was not able to observe multiple injuries documented by the SANE nurse because they were not photographed. All of these concessions increased the likelihood that the circuit court would have credited the SANE nurse's assessments over Donovan's if Donovan had testified, even putting aside the potential downside of Donovan's testimony addressed above.

¶43 Horn asks us to place weight on the relatively greater experience of Donovan compared with the SANE nurse in the field of SANE exams and the fact that Donovan attributed some alleged errors by the SANE nurse to her relative inexperience. But Horn fails to persuade us that the qualifications of the two were so dissimilar, or that Donovan so demonstrably proved error by the SANE nurse, that trial counsel should have understood, based on the level of attention and investigation required of constitutionally effective counsel, that the circuit court would likely credit Donovan over the SANE nurse on all relevant points based on these factors.

¶44 While Donovan's report was not a model of clarity, trial counsel should have understood from it that Donovan's opinion about the likelihood of what Donovan termed "a forced or non-consensual episode of intercourse" turned on whether one credited Donovan's interpretations of injuries as opposed to the SANE nurse's interpretations to the extent that the two differed. But even taking that particular shortcoming into account in favor of Horn's arguments, counsel provided a reasonable strategic reason for not calling Donovan. *See **Harrington v. Richter***, 562 U.S. 86, 110 (2011) (a defendant is not entitled to "perfect representation, only a 'reasonably competent attorney'") (quoted source omitted); ***State v. Hanson***, 2000 WI App 10, ¶20, 232 Wis. 2d 291, 606 N.W.2d 278 ("[A] defendant is entitled to a fair trial, not a perfect trial, and an adequate lawyer, not the best lawyer." (citations omitted)).

¶45 In addition, Donovan's testimony would not have had any apparent effect on the circuit court's detailed assessment of what the court concluded was the following additional physical evidence that supported a finding that Horn had physically forceful sexual contact with A.B.:

> [P]hotographs, [stating exhibit numbers,] I think is objective evidence of bruising on the back of [A.B.'s] neck, the bruising on the side of her neck, bruising and abrasions on her neck and on the back, again, of her neck, and bruising on the left side of her chest. That's there. It's impossible to ignore.

A.B. testified that bruising to her head occurred when Horn "forced" her to perform oral sex.

¶46 In sum, Horn fails to show that, under the circumstances reasonably understood by trial counsel at the time, counsel failed to make a defensible strategic choice in deciding not to call Donovan as a trial witness and instead

deciding to rely on counsel's cross-examination of the SANE nurse and other witnesses, as well as his ability to make appropriate arguments on related topics. *See State v. Mader*, 2023 WI App 35, ¶46, 408 Wis. 2d 632, 993 N.W.2d 761 ("[Counsel's] decision not to call an expert and instead to rely on cross-examination was not deficient performance."), *overruled on other grounds by State v. Molde*, 2025 WI 21, ¶24, 416 Wis. 2d 262, 21 N.W.3d 343.

## II. New Trial in the Interest of Justice

¶47    In the alternative, Horn contends that a new trial is required in the interest of justice because the real controversy was not fully tried.  He contends that it was not fully tried because the circuit court was deprived of important evidence, and because arguments made by the prosecutor at trial clouded the issue of what DNA evidence actually could and could not show.  "[I]f it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried," this court "may reverse the judgment or order appealed from."  WIS. STAT. § 752.35; *see also State v. McKellips*, 2016 WI 51, ¶52, 369 Wis. 2d 437, 881 N.W.2d 258 (the discretionary reversal statute should be applied to reverse a conviction "only in *exceptional* cases" (emphasis in *McKellips*)).  We conclude that Horn fails to show exceptional circumstances warranting a discretionary reversal.

¶48    For the most part, Horn's alternative argument rests on the same contentions that we have rejected for reasons explained above.  Setting those contentions to the side, Horn does not develop an argument that the real controversy was not fully tried because trial counsel did not call either Dr. Raichle or Donovan, even if it was not ineffective assistance to fail to call either of them individually.  Such an argument would require development, and we do not

23

address this topic further. Further, the benefits to the defense of any testimony by Raichle or Donovan would have been limited in scope and done little to undermine all of the other incriminating evidence referenced above, as well as the following additional incriminating evidence: the trial testimony of A.B.'s friend that, when A.B. called the friend while A.B. was "trying to get home" from Horn's residence that night, A.B. sounded "very unusual," "very out of breath," "confused," and "like she was crying"; and Horn's acknowledgment that he was aware of no motivation for A.B. to falsely accuse him of sexual assault.

¶49 What remains are arguments related to testimony by Dr. James O'Donnell, who has a doctorate in pharmacology. O'Donnell provided an affidavit and testified at the postconviction hearing, and Horn submits that the case was not fully tried in part because O'Donnell was not called as a witness at trial. We now summarize and address in turn Horn's arguments based on O'Donnell's averments and testimony.

¶50 *Video evidence issue*. After reviewing case materials that included reported statements of Horn and A.B., as well as the videos showing part of the walk by Horn and A.B. to Horn's apartment building, O'Donnell briefly asserted that, in viewing the videos, he saw no evidence of A.B. staggering or having great difficulty in walking, as she had asserted in some of her accounts regarding the walk with Horn from the last bar to his apartment building. We conclude that this aspect of O'Donnell's testimony, aimed at impeaching A.B.'s version of events, was not significant for at least two related reasons.

¶51 First, this observation by O'Donnell did not appear to depend on any knowledge of pharmacology, and in independently reviewing the videos, we discern room for varied reasonable interpretations. The videos purport to show a

few minutes of the two walking from the last bar to Horn's apartment building. One reasonable interpretation of the videos is that A.B., while she was obviously conscious and able to move her legs, had one arm consistently draped over Horn's shoulder, and the two did not consistently walk in a straight line. One possible interpretation is that A.B. was relying on Horn in order to walk, and that if she had tried to walk on her own at any point, she might have staggered. This would be consistent with A.B.'s trial testimony: "I remember holding onto [Horn] because I was a little unsteady…," and "I felt really out of it so I just focused on holding onto" Horn. In sum, O'Donnell's opinion about what he sees in the videos is based on the premise that Horn and A.B. were, in the words of postconviction counsel, "ambulating in a normal way," but under one reasonable interpretation, the pair stands out from the flow of other pedestrians in their somewhat awkward way of walking, with her hanging onto Horn.

¶52 Second, trial counsel made extensive argument to the circuit court at trial about purported inconsistencies between A.B.'s statements and testimony and what is seen in the videos. O'Donnell's testimony would have added little to what trial counsel would have reasonably understood about how the court might interpret the video at trial in light of all of the evidence at trial, including the testimony given by both Horn and A.B.

¶53 *"Blackouts" and memory.* O'Donnell averred and testified to several opinions relating to the facts that both Horn and A.B. testified that they were drinking alcohol at multiple bars that night and had spotty or completely missing memories of what happened at various times, and also relating to A.B.'s testimony that she was unable to move, or had only a limited ability to move, all or parts of her body at various times.

25

¶54    Additional background relevant to these issues is that A.B. testified that, in addition to the alcohol she drank that night, she was also taking two prescribed medications to treat depression and a third drug to manage post-traumatic stress disorder.

¶55    One of Horn's interest-of-justice arguments is based on O'Donnell's opinion that a person suffering from what O'Donnell described as an "en bloc blackout" (that is, extended complete amnesia) can, as a conscious person, make "intentional decisions" and "appear[] responsive to [the person's] surroundings" and to other people.  A pro-defense implication of this testimony would be that, even if the circuit court were to credit A.B.'s testimony about her lack of memories at certain points, Horn might have reasonably believed, based on A.B.'s conduct, that she was capable of consenting to intercourse, even if she later failed to remember parts of the night.

¶56    This is a weak basis for reversal.  Horn does not persuade us that the circuit court at trial did not understand that it is possible for a person who later has no memory of an incident, substantially due to alcohol consumption, to act and function in normal-appearing ways at the time of the incident (putting to the side the issue of whether a person who has lost memories of an incident might have been incapacitated at the time of the incident).  Further, Horn testified that he had no memories whatsoever of how A.B. acted at the time of either alleged act of intercourse, and therefore O'Donnell's testimony was not needed to assist the court in evaluating an account by Horn about how A.B. acted or appeared.  This undermines some of the value of O'Donnell's potential testimony in giving the court a new basis to find that A.B. appeared to Horn to be capable of giving consent.

¶57    Horn also argues, in effect, that O'Donnell's testimony was necessary to show the circuit court that A.B. was not credible when she testified that she experienced a "blackout," which would have cast doubt on her account of the alleged sexual assaults.  According to O'Donnell, as a matter of science, A.B. was not "likely" to have experienced a "blackout."  O'Donnell based this opinion on: the amount of alcohol which A.B. reported consuming that night; the reported timing of consumption; and A.B.'s reported body weight.  O'Donnell purported to establish that A.B. could have had a blood alcohol content of no more than .071 by midnight, and that "[b]lackouts do not typically occur until .12 - .15."  On a related note, O'Donnell testified that the medications that A.B. reported taking, even when taken in combination with alcohol, could not have "had anything to do with her reports of near paralysis, incapacitation, unable to move her arms or legs or open her eyes."

¶58    This testimony has little value for several reasons.  It fails to recognize that A.B. testified at trial that the incapacitation arose over time and grew worse, particularly at the time of the alleged assaults in Horn's residence.  As the circuit court recognized in its postconviction motion decision, A.B. did not claim in her trial testimony to have experienced a complete, sudden "en bloc" blackout.  Further, the court noted that O'Donnell acknowledged in his testimony that A.B.'s blood alcohol content might have been significantly more than O'Donnell assumed for purposes of his calculations depending on the precise number of drinks, how much alcohol bartenders poured into mixed drinks, and A.B.'s actual weight at the time.  As for the combined effect of the medications with alcohol, O'Donnell primarily asserted that, since A.B. had been taking the medications in the past along with alcohol and had not reported similar physical problems, it seemed unlikely that she would suffer these effects on the night of the

alleged assaults. But again, it was not clear from the record how much alcohol she had consumed, and O'Donnell's testimony is not weighty for the proposition that A.B.'s account of her perceptions was false.

¶59 Horn argues that the circuit court demonstrated a faulty understanding, which O'Donnell could have corrected, about how various kinds of "blackouts" of memories can occur when the court found that Horn lied in giving his account of a lack of memory, but Horn fails to support this argument. Horn does not use any point that O'Donnell made in the postconviction proceedings to establish faulty reasoning or factfinding by the circuit court. Horn's testimony at trial reasonably supports the court's observation that Horn testified to having clear memories of what happened that night right up until he claimed to have experienced—at a critical moment—what the court characterized as a "sudden," "total blackout" of memory. Horn does not persuade us that O'Donnell's testimony at trial would have altered the court's view that Horn's testimony was "so far-fetched" that it defied belief.

¶60 As the circuit court noted in its postconviction motion decision, absent contemporaneous blood or urine tests of Horn and A.B., much of O'Donnell's testimony had to rest largely on speculation.

¶61 *A.B.'s testimony about her limited mobility.* O'Donnell averred that the "effects" of A.B.'s reported "paralysis, rapid and extreme fatigue[,] and short cycles of consciousness and lack of consciousness [are] not consistent with alcohol consumption alone or taken with medications or recreational drugs." After the State directs us to authority for the proposition that paralysis is a response often reported by victims of sexual assaults, Horn does not dispute the point. Instead, Horn responds that this is "irrelevant," because A.B. "also claimed

paralysis" while she and Horn were at the last bar that they visited that night. Horn's assertion is not accompanied by a citation to the record, but we take this to be a reference not to A.B.'s trial testimony, but instead to statements attributed to her by police. At trial, A.B. testified that, while she was at the last bar, "everything was starting to go fuzzy" to her, and she "was getting really lethargic[,] and I didn't really process what was going on around me," but she was able to talk with Horn. She testified that she "was going towards being incapacitated," but that she was able to move her body and open her eyes while at the last bar. In her trial testimony, she denied saying anything different to police about her capacity to move and open her eyes while at the last bar.

¶62 Again here, O'Donnell's testimony might have, at best, put a scientific gloss on commonsense concepts that were fully tried to the circuit court. O'Donnell's conclusions are stated in general terms; for example, "rapid and extreme fatigue" could have a broad range of meanings. His conclusions do not in themselves cast doubt on A.B.'s testimony that was not already cast by arguments competently presented by trial counsel.

## CONCLUSION

¶63 For all of these reasons, we affirm the judgment of conviction and the order denying Horn's postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

29